Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff brings this action under the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 869, 992, 41 U. S. C. 106 note (Supp. II, 1946 Ed.), to recover for losses it sustained in the performance of certain war contracts. The relevant sections of the statute read as follows:
Where work, supplies, or services have been furnished between September 16,1940, and August 14,1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941, (50 U. S. C., Supp. IV, app., sec. 611), such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President within sixty days after the date of approval of this Act, to consider, adjust, and settle equitable claims of contractors, including subcontractors and materialmen performing work or furnishing supplies or services to the contractor or another subcontractor, for losses (not including diminution of anticipated profits) incurred between September 16, 1940, and August 14,1945, without fault or negligence on their part in the performance of such contracts or subcontracts.
* * * * *
. Sec. 6. Whenever any claimant under this Act is dissatisfied with the action of a department or agency of *466 the Government in either granting or denying his claim, 'such claimant shall have the right within six months to file a petition with the Court of Claims * * * ashing a determination by the court of the equities involved in such claim; and upon the filing of such a petition, the court, sitting as a court of equity, shall have jurisdiction to.determine the amount, if any, to which such claimant and petitioner may be equitably entitled * * *.
The parties have stipulated that the losses amounted to $91,086.86. The sole question to be determined is whether the losses were incurred without fault or negligence of the plaintiff.
Plaintiff is a New York corporation which had its principal place of business at all times material to the question at issue in Buffalo, N. Y.
Plaintiff had a number of contracts with the Government during the period September 16, 1940, to August 14, 1945. It sustained an overall loss of $94,895.48 in the performance of these contracts. The net loss attributable to the two contracts involved in this litigation was $91,086.86.
Plaintiff was a small manufacturer of trousers. By December 31, 1942, plaintiff employed only 30 to 35 persons. It had about 40 sewing machines, all of them single-needle machines: Prior to that time it had never produced more than 700 trousers per day.
•On December 29, 1942, plaintiff sent a telegraphic offer to manufacture 250,000 khaki cotton trousers for Lend Lease at 80 cent's per pair. The specifications called for walking shorts with double needle’ seaming. The Government was to furnish the cloth, the plaintiff the other necessary materials. A formal contract was entered into on December 31, 1942.
Subsequently plaintiff made an offer to manufacture another 100,000 trousers of -the same type, except with single needle seaming. A contract for this amount was dated January 20, 1943, and stipulated the price at 80 cents per pair. The delivery schedule for the contracts contemplated delivery of 341,000 trousers by June 19, 1943, with a maximum production of. up to 24,000 units per week. It was evident, therefore, that to fulfill its obligations under the contracts *467 would liave required greatly expanded facilities and stepped-up methods of production on the part of the plaintiff.
In January plaintiff secured the services of Mr. Louis Stein, a production man of long experience, as its plant superintendent. About that time it was decided to change the method of production from the bundle system to what is called the straight-line system. The latter system is described as the “production line installed in the needlework industry.” Plaintiff expected to expand its production by installing four such lines, by purchasing much additional machinery, and hiring many new employees.
The plaintiff made its bid with the understanding it would' receive preference rating certificates to enable it to purchase certain specific items of machinery. The plaintiff did not show that it did not receive these certificates. It made considerable effort to obtain the necessary machinery but it never did secure enough of the equipment it needed to produce the contract items in sufficient numbers to maintain the production rate of 4,000 pairs of trousers per day as required by the contract. Plaintiff claims that the Government was at fault in not assuring it the necessary supply of machines, but we do not think the Government ever undertook to do so. All that the Government did was to promise the certificates, not the actual machines.
■ The usual method under the priorities system was to issue preference certificates which would enable the holder to purchase and use the designated critical materials wherever they might be found. It would-have been wholly impracticable for the Government to undertake, under wartime conditions, to actually locate the materials for all the thousands of production contracts. It did undertake to assist essential wartime contractors by furnishing preference certificates, and by providing that without them a contractor could neither purchase nor use essential wartime materials.
Plaintiff had hired a number of operators with little or no experience in the needle trades. These persons had to be trained and closely supervised. Due to the presence of many higher-paying war industries in the Buffalo area, plaintiff had a high turnover in its personnel which created additional problems of training and supervision. This was an area of *468 serious labor shortage both at the time the bid was submitted and during performance of the contract, and this fact was known to both plaintiff and defendant at both times. These difficulties were compounded by reason of the trousers’ complicated buckle assembly, a part which could be attached properly to the garment only by a tailor of real skill.
. The plaintiff’s difficulties soon became evident in its production. It fell behind in deliveries and had a high rate of rejection. ■ On March 17 Major Christie of the Philadelphia Quartermaster Depot made an investigation into the difficulties at plaintiff’s plant. He observed insufficient machines and a great excess in cut garments over the amount that could then be utilized for sewing. Another representative of the defendant investigated the conditions at plaintiff’s plant on May 14. He observed that the plant was greatly overcut and that of the 2 day-shift and 2 night-shift lines only 1 was operating satisfactorily. The inefficiency of the operators was due largely to lack of adequate supervision. Overcutting hampered operations by cluttering the factory and causing the cut cloth to become dirty and unraveled.
Plaintiff makes much of the fact that 29 contracts were awarded for this type of garment at the time plaintiff made its 2 contracts and that, as of June 24,1943,21 contracts were delinquent. But delinquent contracts other than plaintiff’s were about 36 percent delinquent at that time, whereas plaintiff’s contracts were over 55 percent delinquent. Nor do we think plaintiff is justified in asserting that the Government was as much at fault in awarding the contracts to plaintiff as plaintiff was in accepting them.[1] It is unquestionably true that plaintiff was operating under most difficult conditions; we- cannot say, however, that plaintiff has shown that the. losses which did occur were without its fault. We think, on the contrary, that deficiencies in organization and management were largely responsible for plaintiff’s losses. It certainly is no fault of the Government that plaintiff had prior *469 or concurrent commitments in its civilian business as a result of which plaintiff diverted part of its productive capacity from military to civilian work. Moreover, some of these commitments were incurred while plaintiff was experiencing the very difficulties with its military work that we have described and some of the diverted labor had undoubtedly been trained for work on the military contracts.
Plaintiff has tried to show that other contractors suffered losses on the walking shorts contracts. The evidence on this point is not very extensive. Moreover, this line of proof cannot be very persuasive unless it is fairly clear that the other contractors who form the basis of the comparison were themselves typical and were themselves without fault.
We do not think that a mere minor fault would preclude plaintiff’s recovery. But that is not the instant case. Plaintiff’s losses, though perhaps in some minor part attributable to the fact that plaintiff made its bid too low, are largely attributable to its own poor organization so that it cannot be said that plaintiff suffered losses without fault on its part.
Plaintiff undertook to deliver under a contract which required it to expand production, machinery, and labor many-fold. Perhaps anyone was bound to fail in these circumstances. But in view of plaintiff’s deficiencies in coping with the managerial problems which such an expansion raises, plaintiff’s failure is attributable largely to factors for which plaintiff assumed responsibility.
Plaintiff’s petition will be dismissed.
It is so ordered.
Labamoee, Judge; MaddeN, Judge; Whitakee, Judge; and LittletoN, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report, of Commissioner William E. Day, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is and at all times hereinafter mentioned was a domestic corporation, duly organized and existing under the laws of the State of New York. Its principal place of business at all times material herein was at Buffalo, New York.
*470 2. Prior tó and from September 16, 1940, to August 14, 1945, plaintiff was engaged in the business of manufacturing men’s trousers, pants, and/or shorts.
3. During the period September 16, 1940, to August 14,, 1945, plaintiff entered into seven contracts with the United States, acting through the War Department, numbered as follows, for the manufacture of men’s trousers, pants and/or shorts:
Contract No. W-661-qm-8375
W-669-qm-13853
W-669-qm-15091
W-669-qm-19750
W-669-qm-20310
W-669-qm-24956
W-669-qm-25778
.4 In the performance of the above-numbered contracts, ■plaintiff incurred a net loss of $94,395.48.
5. The first five contracts listed above, covering the manufacture of army wool serge trousers, had all been satisfactorily performed prior to December 1942.
• 6. The plaintiff had been engaged in the manufacture of pants continuously since 1919.
7.- The plaintiff’s action, founded upon the Lucas Act (60 Stat. 902 and 62 Stat. 992), seeks to recover the net loss, it .sustained under the last two contracts listed in finding 3, The parties have stipulated that the net loss related to suck two contracts was $91,086.36. The entire amount of such loss was incurred within the period September 16, 1940, to August 14,1945.
' 8. By December 31, 1942, there were only 30 to 35 employees employed by the plaintiff. Its sewing machinery was limited to no more than 40 machines, all of which were single needle machines. The maximum production of trousers produced by the plaintiff prior to the above-mentioned date was 700 pairs per day.
9. On December 29,1942, the plaintiff, by Harvey Shaffer, its vice president, sent a telegraphic offer to manufacture 250,000 khaki cotton trousers, knee length under all terms and conditions of the invitation to bid, at 80 cents per pair. By .the telegram the plaintiff offered in the alternative to *471 manufacture 500,000 pairs of the same item at 85 cents per pair. The bid was placed with the understanding that the plaintiff would receive preference rating certificates to enable it to purchase certain specific items of machinery. By the terms of this telegraphic offer, deliveries on either of the above quantities were to be 5 percent in 60 days, 20 percent the next 30 days, 35 percent the next 30 days, and the balance within the following 30 days.
10. The telegram referred to in the preceding finding was received on the next day, December 30, 1942, by Captain Ely B. Callaway, Jr., who was a contracting officer in the Philadelphia Quartermaster Depot. The offer contained in the telegram was accepted, and contract No. W-669-qm-24956 was entered into between the plaintiff, by Harvey Shaffer its vice president, and the defendant, by Captain Callaway, contracting officer, acting through the War Department. The contract was entered into as of December 31, 1942, for the manufacture of 250,000 pairs of trousers, cotton, khaki, knee length, in various specified sizes, at 80 cents per pair. The above-described trousers or shorts as they are sometimes called were to be Type II, trousers made with double needle seaming. By the terms of the contract, the cotton twill and cotton drill were to be furnished by the defendant, and the thread, gimp, buckles, buttons and labels were to be furnished by the contractor.
11. The schedule of deliveries under this contract provided:
Five percentum (5%) within sixty (60) days; twenty percentum (20%) within the next thirty (30) days; thirty-five percentum (35%) within the next thirty (30) days; and the remainder of the quantity contracted for complete within one hundred fifty (150) days after date of receipt of first shipment of Government material (constructive or actual date whichever may be earlier)'.
The contract provided further with respect to deliveries as follows:
AcceleratioN of deijcveries : Delivery requirements, as set forth in this contract represent minimum quantities, to be delivered by contractor by. the scheduled dates; However, contractor may, at his option, accelerate and increase the minimum deliveries to any extent,, providing, the total of such accelerated and increased deliveries *472 does woi exceed the total quantity stipulated in the contract.
Delay xsr delivery : The Government reserves the right to charge contractor damages resulting from delay in making deliveries, including field inspection costs incurred after the final delivery date of the contract.
12. Preference rating AA-5 was assigned to the deliveries under the contract. The necessary preference rating for the items of equipment which the plaintiff needed for the performance were secured.
13. Thereafter on January 18, 1943, the plaintiff sent a telegraphic offer to the defendant by which it offered to bid on a quantity of 100,000 trousers identical in all respects except that they were to be Type I, made with single needle seaming. This offer was likewise accepted, and a contract between the plaintiff and the defendant, No. W-669-qm-25778 dated January 20,1943, resulted which called for the manufacture of 100,000 pairs of knee-length cotton khaki trousers at 80 cents per pair.
14. The schedule of deliveries under this contract provided as follows:
Five percentum (5%) within thirty (30) days after date of receipt of first shipment of Government material (constructive or. actual date, whichever may be earlier); twenty percentum (20%) within the next thirty (30) days; then twenty-five percentum (25%) each thirty (30) days thereafter until the quantity contracted for shall have been completed.
The contract contained provisions with respect to acceleration, of deliveries and delay in deliveries identical to those quoted in finding 11 applicable to the earlier contract.
15. The two contracts for a total of 350,000 pairs of trousers, cotton khaki, knee length, were awarded as a result of a requirement by the defendant (for Lend Lease) of in excess of two million such trousers. In all, 29 contracts were placed, including those with the plaintiff, of which five were placed in the Buffalo, New York, area. The contract prices were generally comparable in all 29 contracts.
16. Buffalo, New York, was an area of serious labor shortage, both at the times the plaintiff submitted its bids and düring performance by the plaintiff. This fact was *473 known at both, times by both the plaintiff and the defendant’s contracting officer.
17; The plaintiff, shortly after the awards, hired two additional foremen who had had long experience in the manufacture of pants. With another foreman who had been employed for a number of years by the plaintiff, they constituted the three foremen whose task it was to directly supervise the plaintiff’s factory labor.
In January the plaintiff secured the services of Mr. Louis Stein, who had had long experience as a production man, as its plant superintendent. He was hired on the basis of a salary plus a bonus of one cent per pair of trousers produced.
18. Production in the plaintiff’s factory had, prior to the two contracts in suit, been performed by the bundle system. By this method, after cutting had been performed, bundles of material were handed to a sewing operator for the sewing of a particular operation, and after it had been accomplished the bundle would be passed on to the next operator who would perform the subsequent sewing operation. By passing the bundles through a succession of operations the sewing was completed, and the inspection and pressing followed.
19. The plaintiff’s officers concluded either before or after Mr. Louis Stein came to work for the firm to change over the production method from the bundle system to what is called the straight line system. By this method, as each operation is completed in a line of operators, the piece is passed on to the next.operator, and when it has reached the end of the line where the inspector is located the garment has been completed. This method was described^ by one witness as the Henry Ford production line installed in the needlework industry.
20. Stein reported to the plaintiff’s plant in early January 1948, and for the next two or three weeks the plaintiff was engaged in completing production of civilian trousers. In the meantime Stein was engaged in planning the production operations. He immediately advised Mr. Shaffer, to whom he reported, of .the additional machinery which would-be needed, and he spent some time making trips to New Tork, Chicago, aid St. Louis to purchase such equipment.
*474 21. The plaintiff never did secure, enough of the equipment it needed to produce the contract items in numbers to maintain the production rate of 4,000 pairs of trousers per day as required by the contracts.
22. Arrangements for financing were worked out, with two local banks participating in such arrangements. This was completed in late January or early February 1943. In this' connection an accountant was brought in who made some computations for the plaintiff in connection with bank loans. Projections were made by such accountant from information furnished by the plaintiff’s executives which indicated a labor cost of 65 cents per hour for operators, 75 cents an hour for one forelady per line, with a total of 63 factory workers per line. It was anticipated at this time that production would commence on one line during the week of February 20,1943, with 4,000 pairs produced. By February 27, 1943, it was expected two lines would be operating and producing 5,000 pairs per week, with a third line operating the third week, with production at 9,000 pairs during that week and 11,000 pairs the following week. By March 20, 1943, it was expected that four lines would be operating and producing 12,000 pairs per week, increasing to 16,000 during the week of March 27, 1943, 20,000 pairs per week during the next week, and 24,000 per week from April 10, 1943, through June 19, 1943, by which time 341,000 were to have been delivered. When plaintiff submitted its bid on the first contract the prevailing wage for basic labor was 40-45 cents per hour. In March and April the basic labor cost was 60-75 cents per hour.
23. The first Army resident inspector reported to plaintiff’s plant February 1, 1943/ By that time work in the cutting rooms had begun on the single needle contract (No. 25778), and sewing apparently began that week. The second Army resident inspector reported during the week ending February 27.
24. Production on the single, needle contract was slow in the .early stages, and it was not until March 13, 1943, that 3,500 trousers were packed and ready for shipmént. By the next week, March 20, 1943, 9,000 were ready for shipment.
*475 25. By February 23,1953, work began on the double needle contract (No. 24956).
26. By March 17, 1953, production on the single needle contract was 750 pairs per day, and on the double needle contract it was about 350 pairs per day.
27. On March 17, 1943, Major George Christie, who was director of manufacturing at the Philadelphia Quartermaster Depot, was ordered to proceed to the plaintiff’s plant to assist with problems facing the plaintiff company. He arrived on that day and was told by the plaintiff’s officers that no shipments had been made on either contract and certain production problems had been encountered, and the plaintiff was unable to meet its payroll the following Friday, the 17th being a Wednesday. He was told that difficulty was encountered in securing machinery as well as trained sewing operators, that all labor hired had to be trained and that it would take some time to train operators. Christie observed that there were not sufficient machines on hand and that machines were still being assembled for additional lines which were being installed. The work in the cutting room had advanced far ahead of the other factory operations. The factory was overcut since there were 63,000 pairs cut of which 12,500 were in the process of sewing, 5,500 pairs in process of examining, and 4,000 awaiting the sewing of the straps and buckles. Overcutting is not a good practice in a clothing factory. The overcut cloth takes up space and has á tendency to unravel and become dirty.
28. Most of the employees engaged in sewing operations throughout production on the contract work had little, if any, prior experience in the needle trades. Because other war industries in the Buffalo area paid higher wage rates, the turnover of the sewing labor was extremely high which required that replacements in turn had to be trained.
29. The rejection rate throughout most of the performance period by the plaintiff was extremely high. Twenty, thirty, and even sixty-five percent rejections were reported by the resident inspector in his weekly reports to his superior officers. Garments were rejected for a variety of reasons common among which were deficiencies in sewing operations and failure to follow the contract specification requirements *476 regarding shade marking to insure uniform shade throughout the garment. Belt loops, which in a finished garment measured % inch by 4y2 inches, which did not match the garment as to color were the cause of a great many rejections.
30. Because of the plaintiff’s delinquent deliveries, on May 14,1943, Frank A. Beebe, the defendant’s officer in charge of inspection of clothing and equipage, went to the plaintiff’s plant to see what might be done to assist the plaintiff in its difficulties. He was the superior officer of from 300 to as many as 1,200 clothing inspectors. At this time 44,000 pairs had been shipped under the single needle contract and 34,200 pairs had been shipped under the double needle contract, compared to a contract requirement of 50,000 pairs by May 3 under the single needle contract and 150,000 pairs by May 13 under the double needle contract.
Beebe observed that the plant was greatly overcut, having bundles of cut cloth piled under every cutting table in the plant and in every available spot where it might .be piled, and he observed further that most of the bundles were covered with a thick coating of dust. There were at that time about 10,000 rejected garments in the plant and 25,000 completed except as to the sewing of the loop and strap assembly. At this time Beebe saw in operation two lines on the day shift and two on the night shift. Of these only one line on the day shift was operating satisfactorily.
Inefficiency of operators was due largely to lack of adequate supervision. Though Mr. Stein, the plant superintendent, was entirely competent, the job was too extensive for him to supervise alone. At least one of the foremen originally hired had left by this time.
31. The plaintiff on May 13,1943, sent the following letter to the contracting officer:
We have contracted to manufacture 350,000 pairs of Trousers, Cotton Khaki, Knee Length under contracts #W669-qm-24956 and #W669-qm-25778 at 800 per pair. To date we have shipped approximately 68,200 pairs leaving a balance of 281,800 pairs to be manufactured and shipped.
In contracting to make these trousers at 800 per pair, we made an honest, serious mistake in calculations. *477 Although we have been engaged in the manufacture of trousers for twenty-four years and felt we had knowledge of production costs, our bid was made at a figure far below our actual cost.
There are two primary reasons for our miscalculation. First, our bid was made at a time when we had reason to believe experienced labor would cost 400-450 per hour. Actually, we are now paying 650-700 per hour for partially experienced operators and since we are in a zone in which the W. M. C. requires a 48 hour work week, our operators get over $1.00 per hour one day each week. Second, our estimate of time required for the belt and buckle assembly was woefully inadequate. Making the belt and buckle straps and attaching them to the trousers costs almost as much as our original estimate of cost for manufacturing the trousers complete.
We are using the unit line system of production and • at present are operating three unit lines of 60 operators each on the 8 hour day shift and two unit lines of 60 operators each on the 4% hour night shift. Our day shift, Unit #1, is our best unit and the attached production cost figures taken from our books are based upon cost on this unit.
Naturally, the costs on the other lines are substantially higher. While our production cost is $1.01 per garment on our best lines, the composite cost computed on entire production is at present $1.20%. Of course, we hope to eventually reduce the over-all operations cost to the $1.01 per garment figure, but frankly cannot see how this figure can be reduced.
Please note that the $1.01 cost figure does not include provision for administrative expense, officers’ salaries, depreciation on equipment, taxes (other than Social Security taxes) etc., nor does it include personnel expenses such as advertising for operators, and various sums spent for employees morale.
To date we have lost over $50,000. Of course, part of this loss is due to the expense of training operators and other initial non-recurring expenses, but our actual loss is very substantial even with these items eliminated. It has taken us months to develop an organization equipped for this operation, and now that it is in good functioning order it is doomed to disintegration, unless we can obtain financial relief.
Accordingly, we respectfully request that the price paid to us per garment be raised to an amount that will enable us to operate without loss. We realize that requests for increase in price are highly irregular, but un *478 less we obtain relief we will be faced with insolvency proceedings. Aside from the fact that we desire to keep our business from financial ruin, we would also like to fulfill our obligations to the war effort. We have approximately 500 good machines already set up and in good condition and have approximately 500 experienced operators. If the depot is in need of garments, it would be detrimental to the war effort to lose the availability of our well equipped plant and experienced staff of operators.
For further information may we suggest that you communicate with Lieut. Frank Beebe of your depot who spent three days here studying our operations.
Our financial situation requires urgent action. We will greatly appreciate your immediate cooperation.
Very truly yours,
David Ballotin, Vice-President Buffalo Faultless Pants Co., Inc.
db: ew encl.
SCHEDULE OF COST — UNIT ‡ 1
Cutting_$0. 03
Sewing_ . 46
Cleaning-:_ . 05%
Pressing_ . 04
Examining_ . 02
Packing_ . 02
Repairing- . 06%
Supervision_ ■ . 06
Mechanics- . 02
Cost of Component Parts & Packing Box_ . 10
Office Salaries_ . 04
Social Security_ . 05
Rent, Heat, Gas, Light_ . 05
Total_$1.01
ITEMIZED COST OF COMPONENT PARTS
Thread_ . 04
Buttons- . 01%
Labels- . 00%
Paper- . 01
Cases_ . 02%
Buckles- . 00%
Nails, Stencil & Strap- .00%
Cost of Our Materials_ .10
On June 8,1943, the plaintiff sent the following telegram to the commanding officer of the Philadelphia Quartermaster Depot:
*479 RE CONTRACTS 24956 AND 25778 LOSSES TO DATE IN EXCESS OF $50,000 DUE TO UNEXPECTED HIGH LABOR COSTS AND UNFORESEEN MANUFACTURING DIFFICULTIES. HAVE COMPUTED PRESENT COST OF $1.01 PER PAIR INCLUDING OVERHEAD BUT NOT INCLUDING PROFIT TO PREVENT FURTHER LOSS AND ENABLE US TO CONTINUE TO MANUFACTURE WE REQUEST CHANGE IN PRICE TO $1.06 PER PAIR OR COST PLUS BASIS. HAVE 203 MACHINES AVAILABLE AND 250 TRAINED OPERATORS. CAN PRODUCE AND SHIP APPROXIMATELY 7,500 PAIRS PER WEEK PROBABLY MORE. WILL FURNISH ANY FURTHER INFORMATION DESIRED.
The above Communications are relied upon by the plaintiff as its written requests for relief required by the terms of the Lucas Act.
32. The buckle and strap assembly was much more difficult to sew on the body of the trousers than the plaintiff realized when it entered into the contracts. The plaintiff’s vice president testified that “it took a real skilled tailor to do. It was just impossible to do unless you had an immense amount of skill.” He further testified “Why this * * * thing cost us as much as the rest of the pant, just about.”
33. From November 1942 through May 1943, the plaintiff had salesmen on the road taking orders for civilian business. Cloth was ordered by the plaintiff to fulfill the orders taken in.substantial volume. The sellers of such cloth had been pressing the plaintiff for payment, and such pressure plus the pressure from its salesmen for delivery of civilian pants caused the plaintiff to remove from 25 to 50 percent of its labor from work on the two contracts involved here and to begin civilian production. The plaintiff thus on May 27, 1943, diverted labor which had been.trained in sewing under the Government contracts to fulfill its civilian business, although it was far behind schedule in production on such Government contracts.
34..Sometime during the month of June 1943, Mr. Louis Stein left the employ of plaintiff because he had not been paid in accordance with the arrangements made between himself and plaintiff’s management when he was hired originally. The directing head of the plaintiff, Harvey Shaffer, died on May 25, 1943. . . .'
35. On June 24,1943, Colonel Thomas W. Jones, a superior of the contracting officer at the Philadelphia Quartermaster *480 Depot, sent the following letter to the Quartermaster General:
1. As a result of subject directive a total of 29 contracts were awarded in the procurement of 2,180,000 Trousers, Cotton, KhaM, Knee Length, War Aid.
2. Out of the 29 contracts awarded under subject directive, a total of 21 are delinquent as of this date. This delinquency is due to:
a. At the time awards were made, this Depot was procuring large quantities of Jackets, Herringbone Twill, Special; Shirts, Cotton, Khaki, Special; and Suits, One-Piece, Herringbone Twill, Special, therefore awards were made with many firms which would not normally have been given contracts because they lacked sufficient equipment and experience on this type of item.
b. This item is one which has never been previously made by any contractor. Several specification requirements have made this item particularly difficult to manufacture on a mass production basis.
c. Labor shortages have played havoc with the normal flow of production in almost every instance. It was necessary to place five contracts in Buffalo, N. Y. — one of the nation’s most serious labor shortage areas.
d. Being a new item, many bidders figured their manufacturing costs too low.
3. There is an undelivered balance on all above-mentioned delinquent contracts of approximately 850,000 units. It is believed that the great majority of these contractors will consent to termination of their uncut quantity (estimated at 600,000 units) provided the defaulted contractor can be given assurance that his terminated quantity will not be purchased in the open market.
4. As a result of the following telephone conversations, it is understood that the need for subject item no longer exists:
Colonel Jones, this Depot — Lieut. Colonel Garrett, your office — June 22.
Captain Callaway, this Depot — Mr. Henry Huger, your office — June 15 and June 23.
With this advice from your office, termination on delinquent contracts may be effected without the necessity of purchasing the terminated quantities in the open market. In this manner the Government will not be liable for the usual amounts due the contractor when contracts are *481 terminated under Article 12 — the Termination for Convenience of the Government clause.
5. Several contractors are only slightly delinquent. Under the terms and conditions of the contract amy un-excusable delay in delivery constitutes a breach of the contract, and gives the Government the right of termination. Information is requested as to whether or not this Depot should terminate these slightly delinquent contracts in the same maimer as proposed in paragraph 4 above, or should they be terminated under the “Termination for Convenience of the Government” clause under which they would be entitled to payment for anticipated profits on the undelivered balance, and payment for supplies and material on hand. Another alternative for handling such contracts is as suggested in paragraph 7 below.
6. Several contractors may be on schedule or only slightly delinquent, and may desire to continue operations. Advice is requested as to whether or not these contractors should be allowed to complete their contract.
7. If a contractor is delivering on schedule or ahead of schedule, and yet does not desire to complete his contract, it is suggested that a supplemental agreement be drawn to his contract whereby the contract quantity will be decreased. No payment for anticipated profits and materials on hand should be allowed in such a case.
8. Your comments and advice on each of the above points are requested. Immediate action is urgent so that contractors may be stopped from cutting as soon as possible.
36. On June 24,1943, the contracting officer sent the following letter to the plaintiff:
Reference is had to your Contract W-669-qm-24956 & qm-25778 for Trousers, Cotton, Khaki, Knee Length, W. A.
It is requested that you advise immediately the uncut balance by sizes.
It is also requested that-you advise this Depot if you would consent to a plan whereby your right to deliver the uncut quantity would be terminated at no extra cost to you, except that no payment would be made to you for anticipated profits on your uncut balance or for supplies and materials unused and on hand. It must be understood that this letter in no way alters the present terms and conditions of your contract. This Depot merely wants a statement from you as to your desire to complete your contract quantity for this item.
*482 It is urgently requested that your answer be received at this Depot no later than Tuesday, 29 June 1943.
37. The plaintiff on June 29 replied to the above letter by telegram as follows:
REFERENCE CONTRACT W-669-QM-2495 6 & QM-25778. WILL CONSENT TO PLAN WHEREBY OUR RIGHT TO DELIVER UNCUT QUANTITY WOULD BE TERMINATED AT NO COST TO US AND NO PAYMENT WOULD BE MADE TO US FOR ANTICIPATED PROFITS ON UNCUT BALANCE OR FOR SUPPLIES AND MATERIALS UNUSED AND ON HAND. UNCUT BALANCE BY SIZES FOLLOWS IN LETTER.
38. The defendant on July 10, 1943, sent a letter to the plaintiff cancelling the balance due on the double needle contract, as follows:
Reference is had to Letter of Award dated 31 December 1942, Contract W-669-qm-24956, for 250,000 pairs Trousers, Cotton, Khaki, Knee Length, W. A.
Due to your failure and inability to make delivery in conformance with your contract requirements, and in accordance with your telegram of 29 June 1945, you are informed that under the terms and conditions of Article 5 of the contract, your right to deliver 169,900 pairs Trousers, Cotton, Khaki, Knee Length W. A., in the following sizes and quantities, is hereby terminated.
SIZE QUANTITY SIZE QUANTITY SIZE QUANTITY
Small_ 250 6 — _ 20,475 12_ 7,500
1_ 700 7_ 32,100 13_17,073
3_ 10, 350 9_ 37,175 15_ 1,775
4_ 23,050 10_ 16, 750 16_ 2,775
Purchase of terminated quantity will not be made against your account.
Please acknowledge receipt.
The single needle contract was likewise cancelled.
39. The plaintiff produced only a total of about 155,000 of the 350,000 pairs of trousers covered by the two contracts.
40. From all the evidence in the record, it is found that in sustaining the stipulated losses in the performance of Contract 24956 and Contract 25778 plaintiff was not without fault and that these losses were at least in substantial, part diie to the fault of the plaintiff.
41. On February 6,1947, plaintiff filed with the War Department a claim for relief under the Lucas Act. The War Contract Hardship Claims Board denied plaintiff’s, claim *483 by decision dated November 18, 1948. Plaintiff was notified of such action by registered letter received December 24, 1948.
42. Plaintiff filed its petition in this court on May 18,1949, within six months after receipt of the adverse action by the War Hardship Claims Board.
43. There is no evidence that any action has been taken with respect to plaintiff’s contracts under the Renegotiation Act, the Contract Settlement Act of 1944, or similar legislation. No relief under the Lucas Act is proposed to be granted to the plaintiff by any other department or agency of the United States.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 At the time plaintiff submitted its first bid for the manufacture of 250,000 pairs of trousers, at 80 cents per pair, it made an alternative offer to manufacture 500,000 pairs at 85 cents. Fortunately for it, this alternative offer was not accepted. In these circumstances plaintiff can hardly justify its effort to require the defendant to share the blame for a contract which was beyond plaintiff’s capacity.